UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

MT. HAWLEY INSURANCE COMPANY,    )
   )
      Plaintiff,    )
   )
v.    )    Civil Action No. 2:16-cv-04272-BCW
   )
MCCALLS COUNTRY CANNING, INC.    )
   )
      Defendant.    )

## MT. HAWLEY'S MOTION FOR SUMMARY JUDGMENT
## AND SUGGESTIONS IN SUPPORT

COMES NOW, Plaintiff Mt. Hawley Insurance Company ("Mt. Hawley"), and files its

Motion for Summary Judgment and Suggestions in Support, and would respectfully show the

Court the following:

## I.
## INTRODUCTION

This case involves an alleged first party property insurance claim at McCalls' candle

manufacturing facility. On June 20, 2016, McCalls claimed that the roof of the Property had

been damaged by a hailstorm that allegedly took place nearly two years' prior, on September 1,

2014. Mt. Hawley, its independent adjuster and engineering consultant, inspected McCalls'

facility and found no hail damage. McCalls' own engineering consultant likewise found no hail

damage, and switched to a new theory – wind damage. After Mt. Hawley's consultants

reinspected the Property for wind damage, they reported finding none and Mt. Hawley denied the

claim. Mt. Hawley moves for summary judgment on all claims.

**MT. HAWLEY'S MOTION FOR SUMMARY JUDGMENT**
**AND SUGGESTIONS IN SUPPORT**       **Page 1**
Case 2:16-cv-04272-BCW   Document 49   Filed 02/01/18   Page 1 of 20

**II.**
**SUMMARY JUDGMENT EVIDENCE**

This Motion for Summary Judgment is supported by the following evidence:

**Exhibit A**     The Mt. Hawley Policy

**Exhibit B**     June 21, 2016 email from Mt. Hawley to Greg Martin

**Exhibit C**     June 29, 2016 email from Greg Martin to Mt. Hawley

**Exhibit D**     July 11, 2016 report by Greg Martin

**Exhibit E**     Deposition of Carl Martin

**Exhibit F**     July 15, 2016 emails between Kevin Kirchmer and Carl Martin's office

**Exhibit G**     G&R Construction roof repair receipts

**Exhibit H**     McCalls' Proof of Loss

**Exhibit I**     July 19, 2016 letter from Mt. Hawley

**Exhibit J**     July 22, 2016 report by Kevin Kirchmer

**Exhibit K**     July 26, 2016 report by Carl Martin

**Exhibit L**     September 8, 2016 email from Max Bray to Larry Bache

**Exhibit M**     Max Bray Deposition

**Exhibit N**     September 11, 2016 email from Larry Bache to Carl Martin

**Exhibit O**     September 14, 2016 email from Max Bray to Larry Bache

**Exhibit P**     September 23, 2016 report by Carl Martin

**Exhibit Q**     December 7, 2017 estimate by Max Bray

**Exhibit R**     September 29, 2016 demand letter

**Exhibit S**     October 6, 2016 report by Kevin Kirchmer

**Exhibit T**     October 17, 2016 denial letter

**III.**
**SUPPORTING SUGGESTIONS**

### TABLE OF CONTENTS

I.  Introduction .................................................................................................................1

II.  Summary Judgment Evidence.......................................................................................2

III. Supporting Suggestions .................................................................................................2

   A.  Undisputed Facts.........................................................................................................5

   B.  Legal Authorities and Argument ...........................................................................10

      1.  Missouri insurance law ...................................................................................10

      2.  No evidence of any direct physical loss or damage to the roof of the Property during the Policy Period................................................11

      3.  McCalls' claim does not exceed the Policy deductible .................................12

         a.  Total area "damaged" by wind is less than 5% of the roof ................................................................................12

         b.  Interior water damage, clean-up costs, and repair are excluded ................................................................................13

         c.  1" perlite line item .........................................................................13

         d.  Recalculating McCalls' claim...........................................................14

      4.  Mt. Hawley is entitled to summary judgment on McCalls' vexatious refusal to pay claim..........................................................14

         a.  McCalls' vexatious refusal claim is without merit because there is no coverage under the Policy....................................15

         b.  McCalls' demand was substantially greater than the amount it would be entitled to under the Policy ........................16

         c.  Mt. Hawley's denial was reasonable as a matter of law ...................16

         d.  Mt. Hawley agreed to investigate for wind damage as soon as it became aware McCalls believed wind damaged the Property ................................................................................17

IV. Conclusion .................................................................................................................19

**MT. HAWLEY'S MOTION FOR SUMMARY JUDGMENT**
**AND SUGGESTIONS IN SUPPORT**          **Page 3**

Case 2:16-cv-04272-BCW  Document 49  Filed 02/01/18  Page 3 of 20

# TABLE OF AUTHORITIES

Page

<u>Cases</u>

*Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620 (8th Cir. 2007)........................................................11

*Atlas Reserve Temporaries, Inc. v. Vanliner Ins. Co.*,
　　51 S.W.3d 83 (Mo. App. W.D. 2001)..............................................................................10

*Black & Veatch Corp. v. Wellington Syndicate*, 302 S.W.3d 114
　　(Mo. App. W.D. 2009) ......................................................................................10, 11

*Ceramo Co., Inc. v. Hartford Fire Ins. Co.*, No. 1:05-cv-0098-TCM,
　　2006 WL 2708626 (E.D. Mo. Sept. 20, 2006)....................................................................17

*Chernus v. Kennedy-Coets Construction Co.*, 55 S.W.2d 744 (Mo. App. 1932) ..........................16

*Cross v. Pureless Ins. Co.*, 351 S.W.2d 826 (Mo. App. 1961)......................................................16

*J.E. Jones Const. Co. v. Chubb & Sons, Inc.*, 486 F.3d 337 (8th Cir. 2007)................................10

*Krombach v. Mayflower Ins. Co., Ltd.*, 827 S.W.2d 208 (Mo. banc 1992)...................................10

*Lueckenotte v. Lueckenotte*, 34 S.W.2d 387 (Mo. banc 2001) ...................................................10

*Macheca Transp. v. Philadelphia Indem. Ins. Co.*, 649 F.3d 661 (8th Cir. 2011) ......................17

*Mich. Millers Mut. Ins. Co. v. DG&G Co., Inc.*, No. 1:06-cv-0110-TCM,
　　2008 WL 1766786 (E.D. Mo. Apr. 14, 2008)....................................................................11

*Minden v. Atain Specialty Ins. Co.*, 788 F.3d 750 (8th Cir. 2015)...............................................17

*Missouri Bank & Trust Co. of Kansas City v. One Beacon Ins. Co.*,
　　688 F.3d 943 (8th Cir. 2012) ...................................................................................18, 19

*SJP Props., Inc. v. Mt. Vernon Fire Ins. Co.*, No. 4:14-cv-694-JAR,
　　2015 WL 4524337 (E.D. Mo. Jul. 27, 2015) ....................................................................15

*Two Branch Marina, Inc. v. Western Heritage Ins. Co.*, No. 4:07-cv-1017,
　　2008 WL 2952747 (E.D. Mo. Jul. 29, 2008)....................................................................17

*Watters v. Travel Guard International*, 136 S.W.3d 100 (Mo. Ct. App. 2004) ............................17

## A. Undisputed Facts

1.     McCalls was the named insured under a commercial property policy of insurance issued by Mt. Hawley, policy number MCP0155770, policy period July 1, 2014 to July 1, 2015 (renewed through July 1, 2016) (the "Policy"). *See* Policy (**Exhibit A**) at 2.

2.     On June 20, **2016**, McCalls belatedly notified Mt. Hawley that a September 1, **2014** storm allegedly damaged its candle factory, located at 809 Hwy 50 West, Tipton, Missouri (the "Property").[1] Mt. Hawley immediately hired Greg Martin of Property General Adjusters, LLC to assist in adjusting the loss. *See* June 21, 2016 email (**Exhibit B**).

3.     On June 24, 2016, Greg Martin inspected the Property with William Cox, McCalls' public adjuster. At that inspection, Cox presented Greg Martin with a hail report prepared by Splash Solutions, LLC. *See* June 29, 2016 email (**Exhibit C**). Cox specifically advised Greg Martin that "he would not have taken this loss" if not for the Splash Solutions hail report. *See* July 11, 2016 report (**Exhibit D**). Nothing was presented to Mt. Hawley at that time indicating any strong winds associated with the storm, or that McCalls believed anything other than hail damaged the Property. Thereafter, Mt. Hawley hired engineer Kevin Kirchmer to assist in the investigation of the Claim.

4.     On July 5, 2016, Kirchmer and McCalls' engineer, Carl Martin, inspected the Property together. Both engineers agreed that there was no hail damage to the roof. *See* C. Martin Depo. (**Exhibit E**) at 42:17-24; 90:23-91:4. Carl Martin took two roof membrane samples to test for hail damage, but then decided it was not even necessary to test them. *See* July 15, 2016 email (**Exhibit F**).

---

[1] The roof of the Property consists of an EPDM (rubber) membrane covered with river rock "ballast," under which is a layer of insulation and, below that, a layer of perlite board.

5.      During that inspection, one of McCalls' employees pointed out areas inside the Property where the roof had been leaking.  Of course, it is undisputed that McCalls had previously been forced to hire G&R Construction to repair roof leaks at the Property on at least seven occasions prior to the September 1, 2014 storm, as follows:

- March 18, 2013: "Repaired flashings around four HVAC units; Repaired split in roofing membrane on North side of building."
- April 9, 11, and 12, 2013: "Patched roof leaks over entire roof area of Tipton Factory."
- June 28, 2013: "Repaired leaks on McCalls Candle factory"
- June 17-18, 2014: "Investigated & repaired roof leaks at Tipton Candle factory."

*See* G&R receipts (**Exhibit G**).[2]

6.      On July 11, 2016, Greg Martin submitted his first report to Mt. Hawley, including photographs he took during his June 24 inspection.  *See* July 11, 2016 report (**Ex. D**).  He found no hail damage whatsoever to the roof.  *See id.* (**Ex. D**).

7.      On July 18, 2016, Mt. Hawley was presented with McCalls' "partial" Proof of Loss in the amount of $1,114,325.50 (ACV), which was based on an estimate prepared by William Cox to completely reroof the Property.  *See* Proof of Loss (**Exhibit H**).  Mt. Hawley notified McCalls that it was still investigating the claim and could neither accept nor reject the Proof of Loss.  *See* July 19, 2016 letter (**Exhibit I**).

8.      On July 22, 2016, engineer Kevin Kirchmer reported finding no hail-related damage to the roof.  *See* July 22, 2016 report (**Exhibit J**) at 7.  Kirchmer concluded that the reported leaking was the result of long-term deterioration of the membrane seams, long-term deterioration of the penetration flashings, and inadequate roof maintenance.  *Id.*

_____

[2] G&R also repaired roof leaks on September 5, 2014, but McCalls did not call them to conduct any further leak repairs for more than eighteen months, until April 1, 2016.

9.     On August 15, 2016, McCalls provided Mt. Hawley with Carl Martin's report, in which he also concluded that the roof was **not** damaged by hail.  *See* July 26, 2016 report (**Exhibit K**) at 5.  Carl Martin espoused a brand new theory in his report: that **wind** could not be ruled out as a potential cause of "**isolated areas** whereby the insulation substrate had experienced movements and shifting. . . ."  *Id.* at 5-6.  This report does not opine that anything even close to complete roof replacement was required, concluding instead as follows:

> To address the known areas of damage and alteration to the substrate board insulation related to wind uplift, **removal of a portion of the roof membrane would be necessary to allow for the repositioning or replacement of substrate insulation board in the areas where it is known this condition exists**.

*Id.* at 6 (emphasis added).

10.     On September 8, 2016, Max Bray, a litigation consultant who works exclusively for McCalls' counsel, Merlin Law Group, emailed Larry Bache (of Merlin), complaining that Carl Martin's original report did not call for total roof replacement.  *See* Sept. 8, 2016 email (**Exhibit L**).  In particular, Bray advised as follows:

> Larry,
>
> For McCalls Candles, the Engineer [Carl Martin] states that 'portions' of the roofing system should be removed for repositioning of the insulation substrate. We need a footage recommendation from the Engineer in order to write an estimate commensurate with his findings.  I don't think an estimate for a full replacement of the roofing system is consistent with his remarks as they are stated at this time.

*Id.*  Bray admits Carl Martin never provided "a footage recommendation."  Bray Depo. (**Exhibit M**) at 93:4-19; 99:13-20.  Bray never prepared an estimate to repair the roof as recommended by Carl Martin.

11.     On September 11, 2016, Bache forwarded Bray's Sept. 8 email to Carl Martin and indicated that Bray would "reach out and discuss this claim with you to answer a couple of questions."  *See* Sept. 11, 2016 email (**Exhibit N**).

12.     On September 14, 2016, Bray emailed Bache again (copying Carl Martin): "I spoke to Carl Martin this morning regarding the McCalls Candles project. . . . We discussed the nature of the wind lift and damage to the building surface.  I have enough information to prepare my estimate with provision of amending my report following the _final_ Engineering Perspective, Inc. report."  _See_ Sept. 14, 2016 email (**Exhibit O**) (emphasis added).  Neither Bray nor Carl Martin could recall the content of the Sept. 14, 2016 discussion between them.  Bray Depo. (**Ex. M**) at 91:4-92:2; C. Martin Depo. (**Ex. E**) at 131:17-132:14.

13.     On September 19, 2016, the Property was inspected again by Greg Martin, Carl Martin, Mr. Kirchmer, and Mr. Cox.  Five large test cuts were made to the EPDM membrane.  Four of those cuts were in exposed areas where the river rock ballast had previously been removed from the membrane surface; for the other cut the ballast had to be removed first.[3]  After the membrane was lifted up, displaced and shifted insulation boards were observed **only** under the four cuts where the ballast had been previously removed.  Under the other test cut ("Test Cut #2", where the ballast was still covering the membrane), the insulation boards had not shifted.  _See_ October 6, 2016 report (**Exhibit S**) at 5-6.  In addition, there was no evidence of displaced insulation boards throughout the central portion of the roof.  _See id._ at 6.

14.     On September 23, 2016, Carl Martin prepared a second report which he titled "Follow-Up Engineering Evaluation", in which he states the following: "Various areas of **isolated rock ballast movement correlated with areas of substrate deformation** of the membrane were identified."  _See_ Sept. 23, 2016 report (**Exhibit P**) at 3 (emphasis added).  Carl Martin admits that, like his first report, his "follow-up" report does not call for total roof replacement.  C. Martin Depo. (**Ex. E**) at 127:8-128:19; 129:9-16; 130:24-131:1.

---

[3] "Ballast" refers to a layer of river rocks covering the EPDM membrane, the weight of which holds the membrane down and protects it from the elements.

15.    Despite the fact that no expert had ever opined that the roof needed to be replaced, on September 28, 2016 Max Bray inexplicably prepared a revised estimate[4] to completely remove and replace the entire roof of the Property, among other things. The estimate calculated the replacement cost ("RCV") at $725,253.16, and actual cash value ("ACV" = RCV minus depreciation) at $609,555.80.[5]

16.    On September 29, 2016, McCalls demanded Mt. Hawley pay $609,555.80 (the ACV amount in Bray's Sept. 28 estimate). *See* September 29, 2016 letter (**Exhibit R**).

17.    On October 6, 2016, Kevin Kirchmer reported that there was no evidence of wind damage to the roof membrane. *See* October 6, 2016 report (**Exhibit S**) at 6, 9. He concluded that "displaced insulation boards are predominantly confined to areas of displaced gravel; the total affected area is less than 5 percent of the main roof area." *See id*. (**Ex. S**) at 8-9.

18.    On October 17, 2016, Mt. Hawley denied McCalls' claim and instituted this lawsuit seeking a declaration of no coverage under the Policy. See October 17, 2016 letter (**Exhibit T**). McCalls has asserted counterclaims for breach of contract and vexatious refusal to pay under Mo. Stat. §§ 375.296 and 375.420.

### *Applicable Policy Provisions*

19.    The Mt. Hawley Policy provides actual cash value coverage only. *See* Policy (**Ex. A**) at 6. The deductible for damage due to hail and windstorm damage is 1% of total values at risk, with a minimum of $25,000 per occurrence. *See id*. at 4. The Property has a declared value of $3,860,668, resulting in a deductible of $38,607. *See id*. at 6.

---

[4] Bray prepared at least two prior estimates, each of which called for total roof replacement, even after he informed Larry Bache that the conclusions in Carl Martin's first report did not support total roof replacement.

[5] On December 7, 2017, Bray revised his estimate again because he had misidentified the EPDM membrane as being "mechanically adhered," when it is actually "perimeter adhered." This resulted in an overall reduction of approximately $32,000 (ACV). *See* Dec. 7, 2017 estimate (**Exhibit Q**).

20.     The Policy provides coverage for "direct physical loss of or damage to" the Property occurring during the Policy Period, subject to all conditions, limitations, and exclusions therein. *See id*. at 7.  The Policy specifically excludes "loss or damage caused by or resulting from" any of the following: wear and tear, decay, deterioration, cracking, shrinking, expansion, or the neglect of the insured to use all reasonable means to save and preserve the Property from further damage at and after the time of loss.  *See id*. at 22, 24-25.  In addition, the Policy limitations provide that Mt. Hawley "will not pay for loss of or damage to" the interior of the Property caused by or resulting from rain, whether driven by wind or not, unless the Property first sustains covered damage "to its roof or walls through which the rain, . . . enters." *See id*. at 27.

B.     LEGAL AUTHORITIES AND ARGUMENT

        1.      Missouri insurance law

        Under Missouri law, insurance policies are interpreted as any other contract, the ultimate goal being "to ascertain the intent of the parties and then give effect to that intent."  *See Black & Veatch Corp. v. Wellington Syndicate*, 302 S.W.3d 114, 123 (Mo. App. W.D. 2009), citing *Lueckenotte v. Lueckenotte*, 34 S.W.2d 387, 395 (Mo. banc 2001).  Where the policy is unambiguous, the intent of the parties is ascertained from the natural and ordinary meaning of the language used, and the policy should be enforced as written.  *See id*., citing *Krombach v. Mayflower Ins. Co., Ltd*., 827 S.W.2d 208, 210 (Mo. banc 1992); *see also Atlas Reserve Temporaries, Inc. v. Vanliner Ins. Co*., 51 S.W.3d 83, 87 (Mo. App. W.D. 2001).

        The insured has the burden to show that the policy covers its claimed loss.  *See J.E. Jones Const. Co. v. Chubb & Sons, Inc*., 486 F.3d 337, 340 (8th Cir. 2007).  Under an "all risk" policy (such as the Policy), the insured must also establish that its loss was fortuitous in order for coverage to attach: "Under an all-risk insurance policy, recovery will be allowed for all

fortuitous losses, unless the policy contains a specific provision expressly excluding the loss from coverage." *See Black & Veatch Corp.*, 302 S.W.3d at 123-24. If the insured establishes a covered loss, the burden shifts to the insurer to establish that an exclusion precludes coverage. *See Mich. Millers Mut. Ins. Co. v. DG&G Co., Inc.*, No. 1:06-cv-0110-TCM, 2008 WL 1766786, *3 (E.D. Mo. Apr. 14, 2008), citing *Am. Econ. Ins. Co. v. Jackson*, 476 F.3d 620, 623 (8th Cir. 2007). It then becomes the insured's burden to establish that an exception to the exclusion applies to revive coverage. *Id.*

> 2. No evidence of any direct physical loss or damage to the roof of the Property during the Policy Period

As noted above, McCalls has the burden of establishing direct loss of or damage to the Property occurring during the Policy Period. In this case, there is no evidence that the September 1, 2014 storm caused any damage to the roof of the Property. Indeed, McCalls' experts agree that there was absolutely no hail damage to the roof. *See* Bray Depo. (**Ex. M**) at 58:20-59:1; 60:4-8; C. Martin Depo. (**Ex. E**) at 42:17-24; 90:23-91:4. Likewise, there is no evidence whatsoever that wind caused any damage to the roof during the Policy Period. Carl Martin admits that "many storms don't cause leaks, especially an EPDM membrane," and that there was "**no rational connection between leak formations and a specific condition that I find that could be related to a storm.**" C. Martin Depo. (**Ex. E**) at 59:20-24. Carl Martin also admits that normal shrinkage of the EPDM membrane over time can, by itself cause seam separations and splits in the membrane. *See id.* at 91:16-21. Max Bray admits he has no opinion as to whether the September 1, 2014 storm caused any seam separations or splits in the EPDM membrane, which would be necessary for leaks to occur. Bray Depo. (**Ex. M**) at 77:3-10; 122:11-16.

With regard to the displaced and shifted insulation boards under the membrane, Carl Martin admits that he could not rule out that pre-policy wind events caused the displaced insulation boards observed on the roof. C. Martin Depo. (**Ex. E**) at 93:11-19; 93:22-94:2.

Accordingly, against this evidentiary background, McCalls has not established that the roof of the Property sustained any direct loss or damage during the Policy Period. That failure, in and of itself, entitles Mt. Hawley to summary judgment in this case.

3.    <u>McCalls' claim does not exceed the Policy deductible</u>

Of course, even if some covered direct physical loss or damage to the Property had occur during the Policy Period, any such loss would not exceed the deductible. As noted above, the Policy deductible for hail and windstorm damage is 1% of the value of the Property, or $38,607.

a.    *Total area "damaged" by wind is less than 5% of the roof*

As discussed above, both Max Bray and Carl Martin admit that there was **no damage to the EPDM membrane**. Instead, the only wind "damage" to the roof consists <u>solely</u> of displaced insulation panels under the EPDM membrane, which Carl Martin admits could have been caused by pre-policy winds. *See* C. Martin Depo. (**Ex. E**) at 93:11-19; 93:22-94:2; 126:23-127:19; 128:14-18. Max Bray would not express any opinion as to how much of the roof was affected by that condition. Bray Depo. (**Ex. M**) at 105:17-25. He admits, however, that despite his request, Carl Martin never provided a calculation or estimate of the area affected by "wind uplift." *Id*. at 93:4-19; 99:13-20.

Carl Martin admits that it is NOT his opinion that the entire roof needs to be replaced: "There are likely portions [of the Roof] that show absolutely no wind damage. . . . I can't say that I know the entire roof does [need to be replaced]." C. Martin Depo. (**Ex. E**) at 127:8-128: 19.

As such, the only evidence of how much of the roof was affected by "wind uplift" is contained in Kevin Kirchmer's October 6, 2016 report, in which he concludes that "the total affected area is less than 5 percent of the main roof area." *See* Oct. 6, 2016 report (**Ex. S**). Thus, even giving McCalls the benefit of the doubt, any minor damage to the roof caused by the September 1, 2014 storm would be confined to no more than 5% of the total roof area.

### b. *Interior water damage, clean-up costs, and repair costs are excluded*

Bray's most recent estimate (**Ex. Q**) includes costs for cleaning and repainting the interior roof scaffolding, employee labor costs for cleaning up water that leaked into the Property during rainstorms, and roof membrane repairs performed by G&R. It is undisputed that the Policy does not cover interior water damage "caused by or resulting from rain,. . . whether driven by wind or not, unless. . . the building or structure first sustains damage . . . to its roof or walls through which the rain. . . enters." *See* Policy (**Ex. A**) at 27. In addition, the Policy excludes loss or damage caused by wear and tear, deterioration, cracking, shrinking, or expansion. *See id.* at 24. As set forth above, there is no evidence whatsoever that the roof membrane sustained any direct physical loss or damage during the Policy Period. As such, there is no coverage for repainting rusted or discolored roof scaffolding, employee labor clean-up costs, or roof membrane repairs.

### c. *1" perlite line item*

Also included in Bray's most-recent estimate (**Ex. Q**) is a line-item to remove and replace 1" perlite board, at a cost of $135,256.72 (ACV). Bray admits he included removal and replacement of the 1" perlite not because there was evidence it was damaged, but solely because his "intention was to replace the roof system." Bray Depo. (**Ex. M**) at 96:25-97:7. Indeed, Bray

now admits that the perlite should be removed from his estimate. Bray Depo. (**Ex. M**) at 112:22-113:15; 114:8-19; 141:15-22.

    *d. Recalculating McCalls' claim*

   As set forth above, Bray's estimate includes excluded damage and expenses he admits should not be included. When these costs are removed from his estimate, the very most McCalls could recover under the Policy is as follows:

   Main roof area:  $537,071.55 (ACV)

   1" perlite:   <$135,256.72 (ACV)>

   Total main roof:  $401,814.83(ACV)

   Area of roof affected: 5%

   **Total roof damage: $20,090.74 (ACV)**

   Even giving McCalls the benefit of the doubt, adding the removal and replacement of the dock roof ($2,477.05) and siding on the west side of the building ($13,153.45) to the amount to repair the small area of the roof affected by "wind uplift" results in a total ACV of $35,721.24. As noted above, the Policy deductible is $38,607.

   Thus, even assuming McCalls could establish a covered loss during the Mt. Hawley Policy Period (which it clearly cannot), the loss would be within the applicable deductible.

   4.  <u>Mt. Hawley is entitled to summary judgment on McCalls' vexatious refusal to pay claim</u>

   Incredibly, McCalls has also asserted a claim for vexatious refusal to pay under Missouri Statutes 375.420 and 375.296. Contrary to the overwhelming evidence cited above, McCalls alleges that Mt. Hawley did not have reasonable cause to deny its claim. *See* McCalls' Counterclaims [Doc. 7] at ¶¶ 27-28. McCalls also alleges that Mt. Hawley conducted a "sub

**MT. HAWLEY'S MOTION FOR SUMMARY JUDGMENT**
<u>**AND SUGGESTIONS IN SUPPORT**</u>             **Page 14**

Case 2:16-cv-04272-BCW  Document 49  Filed 02/01/18  Page 14 of 20

par" investigation and failed to fully explain to McCalls why its claim was denied. *Id*. at ¶¶ 29-30. The undisputed facts totally belie McCalls' allegations.

As set forth above, McCalls did not notify Mt. Hawley about its alleged loss until <u>more than twenty months after it purportedly occurred</u>. Mt. Hawley immediately hired an independent adjuster who, three days after McCalls' notice, inspected the Property with McCalls public adjuster, William Cox. While there, Cox presented Greg Martin with a hail report and explained that <u>that hail report was the only reason he took the claim</u>. After Greg Martin and two engineers (including one on behalf of McCalls) found <u>no hail damage</u> to the roof, McCalls abruptly switched its causation theory to "wind uplift." Mt. Hawley then sent its engineer back to the Property and, together with McCalls' engineer, conducted an invasive and destructive examination of the roof, revealing <u>no wind damage to the membrane</u>, and only "isolated areas" of insulation board movement. McCalls' own engineer admits that the insulation board displacement is isolated and that he did not conclude the roof needs to be totally replaced. Moreover, McCalls engineer has admitted that he cannot determine that this insulation board issue was caused by the September 1, 2014 storm that is the subject of this claim. Nevertheless, McCalls demanded Mt. Hawley pay for total roof replacement.

> a. *McCalls' vexatious refusal claim is without merit because there is no coverage under the Policy*

Under Missouri law, an insured cannot maintain a vexatious refusal claim unless it is established that the claimed loss was covered under the policy. *See SJP Props., Inc. v. Mt. Vernon Fire Ins. Co*., No. 4:14-cv-694-JAR, 2015 WL 4524337, *9 (E.D. Mo. Jul. 27, 2015). As set forth above, there is no coverage for McCalls' loss and no breach of the Policy. For this reason alone, Mt. Hawley is entitled to summary judgment on McCalls' vexatious refusal claim.

Of course, it is well-established under Missouri law that an insurer's claim denial is not vexatious in circumstances where, even though coverage is ultimately determined against the insurer, the amount of the covered loss is less than that demanded by the insured. *See, e.g., Chernus v. Kennedy-Coets Construction Co.*, 55 S.W.2d 744, 752 (Mo. App. 1932) ("defendant was not required to make a tender of a lesser amount than that contained on the face of plaintiff's demand."). *See also Cross v. Pureless Ins. Co.*, 351 S.W.2d 826, 829 (Mo. App. 1961) ("no recovery under the statute can be had when the insured seeks a recovery of more than that to which he is entitled.").

In this case, McCalls initially presented Mt. Hawley with a Proof of Loss in the amount of $1.1 million. Thereafter, McCalls reduced its claim, but still demanded that Mt. Hawley pay $609,555.80. As explained above, this $609,555.80 demand is substantially overstated, as Max Bray subsequently revised his estimate down approximately $32,000, and now also admits that his estimate should not have included $135,256.75 to replace the 1" perlite board. Bray Depo. (**Ex. M**) at 141:15-22. Moreover, the only evidence of the total area affected by "wind uplift" is less than 5% of the roof, rendering Bray's estimate for roof replacement overstated by approximately 95%. For these additional reasons, Mt. Hawley is entitled to summary judgment on McCalls' vexatious refusal claim.

*c. Mt. Hawley's denial was reasonable as a matter of law*

Even if it is somehow determined that McCalls' claim is covered under the Policy, Mt. Hawley is still entitled to summary judgment on the vexatious refusal claim. To support a vexatious refusal claim, the insured must prove the following: (1) the existence of the insurance policy; (2) the insurance company's refusal to pay; and (3) such refusal was without reasonable

cause or excuse.  *See Minden v. Atain Specialty Ins. Co.*, 788 F.3d 750, 756 (8th Cir. 2015).

Where the insurer has reasonable cause to believe there is no liability and there is a meritorious

defense to the claim, there can be no vexatious refusal to pay.  *See id.*, citing *Watters v. Travel

Guard International*, 136 S.W.3d 100, 108-10 (Mo. Ct. App. 2004).

Denial of a claim in reliance on the opinion of a qualified expert is not vexatious as a

matter of law unless the expert's opinion was clearly unfounded.  *See Macheca Transp. v.

Philadelphia Indem. Ins. Co*., 649 F.3d 661, 674-75 (8th Cir. 2011) (affirming summary

judgment in favor of insurer on vexatious refusal claim where insurer relied, in part, on expert

reports); *Two Branch Marina, Inc. v. Western Heritage Ins. Co*., No. 4:07-cv-1017, 2008 WL

2952747, *6-7 (E.D. Mo. Jul. 29, 2008) (summary judgment granted to insurer that relied on

qualified experts where there was no evidence that their opinions were unfounded); *Ceramo Co.,

Inc. v. Hartford Fire Ins. Co.*, No. 1:05-cv-0098-TCM, 2006 WL 2708626, *4 (E.D. Mo. Sept.

20, 2006) (summary judgment granted to Hartford: "The undisputed evidence is that conflicting

expert reports by experts retained by Ceramo and Hartford have resulted in a legitimate dispute

over the extent of Ceramo's damage on its business interruption claim.").

In this case, the evidence is undisputed that Mt. Hawley reasonably relied on the reports

of Greg Martin and Kevin Kirchmer.[6]  There is absolutely no evidence whatsoever that Mt.

Hawley's experts were unqualified or that their opinions were unfounded.  This additional reason

entitles Mt. Hawley to summary judgment on McCalls' vexatious refusal claim.

> ### d.  *Mt. Hawley agreed to investigate for wind damage as soon as it became aware McCalls believed wind damaged the Property*

Max Bray has opined that Mt. Hawley's investigation and coverage determination were

unreasonably delayed because Kevin Kirchmer was first asked to investigate the roof for hail

---

[6] Of course, as explained above, McCalls' own engineering expert does not even support McCalls' claim herein.

damage, reported finding none, and then was asked to investigate for wind damage after Mt.

Hawley received Carl Martin's first report. McCalls' contention that this constitutes vexatious

conduct was rejected by the Eighth Circuit in *Missouri Bank & Trust Co. of Kansas City v. One*

*Beacon Ins. Co.*, 688 F.3d 943 (8th Cir. 2012). In that case, the insured bank sought coverage

under a financial institution bond ("FIB") for a fraudulent transfer of funds. One Beacon denied

coverage for the loss under one of the insuring agreements in the FIB. The insured's agent then

asked One Beacon to review the claim under a different insuring agreement. One Beacon did so,

and approximately two months after its first denial, denied coverage under that second insuring

agreement. The bank sued One Beacon for breach of contract and vexatious refusal to pay.

The district court granted summary judgment to One Beacon on the vexatious claim, and

the bank appealed. The court affirmed, holding as follows:

> The district court's finding that One Beacon had reasonable cause to deny
> Missouri Bank's claim is not clearly erroneous. After Missouri Bank filed the
> claim, One Beacon promptly investigated and considered whether the loss was
> covered under Insuring Agreement (K). One Beacon determined that it was not
> and denied coverage. Although One Beacon did not initially consider whether the
> loss was covered under Insurance Agreement (D), its failure to do was not
> unreasonable since Insuring Agreement (K), which applied to
> "Electronic/Computer Systems Fraud/Telefacsimile, Email and Voice Instruction
> Transactions Coverage," seemed most applicable. **As the district court noted,
> One Beacon "fully and promptly considered coverage under Insuring
> Agreement (D)" when asked.**

*Id*. at 949 (emphasis added).

Clearly the same reasoning applies to this case. Mt. Hawley was presented with a claim

for storm damage and hired Greg Martin and Kevin Kirchmer to investigate. During Greg

Martin's inspection, McCalls' public adjuster (Cox) presented him with a hail report and <u>no</u> wind

report or information. During the inspection, Cox even stated to Greg Martin that "he would not

have taken this loss if not for the enclosed Hail Investigation report prepared by Splash

Solutions, LLC." *See* July 11, 2016 report (**Ex. D**). After the inspection, Mt. Hawley hired Kevin Kirchmer, an engineer, to assist in the investigation of the Claim.

Both Kirchmer and McCalls' own engineer agreed there was no hail damage to the roof. McCalls then presented Mt. Hawley with a new "wind uplift" damage theory. On September 19, 2016, Mt. Hawley sent Kirchmer back to the Property to investigate for wind damage. Bray admits that it is legitimate for an insurance carrier to reinspect a covered property when the cause of loss cannot first be determined. Bray Depo. (**Ex. M**) at 170:14-171:2. Kirchmer's second report, dated October 6, 2016, reported no wind damage to the roof membrane and only minor "wind uplift" conditions affecting less than 5% of the roof area. *See* **Ex. S**. Carl Martin agrees that "wind uplift" conditions were "isolated." *See* **Ex. P** at 3.

On October 17, 2016, Mt. Hawley formally denied McCalls' claim. *See* **Ex. T**. As noted above, there is no evidence that Mt. Hawley unreasonably relied on Kirchmer's reports or that its claim investigation activities were unreasonably delayed. *See Missouri Bank & Trust*, 688 F.3d at 949. Indeed, the undisputed evidence clearly demonstrates that Mt. Hawley acted promptly and conducted a full investigation of a claim that was belatedly reported by McCalls more than twenty months after the alleged loss. For these additional reasons, Mt. Hawley is entitled to summary judgment on McCalls' vexatious refusal to pay claim.

## IV.
## CONCLUSION

For all of the reasons above, Mt. Hawley is entitled to summary judgment that there is no coverage under the Policy, as well as on McCalls' counterclaims.

WHEREFORE, premises considered, Mt. Hawley Insurance Company respectfully requests the Court enter an Order granting this Motion for Summary Judgment and for such other and further relief to which it may be entitled.

Respectfully submitted,

*/s/Greg K. Winslett*
GREG K. WINSLETT
Tx. State Bar No. 21781900
gwinslett@qslwm.com
MICHAEL D. FEILER
Tx. State Bar No. 24055475
mfeiler@qslwm.com
QUILLING, SELANDER, LOWNDS,
WINSLETT & MOSER, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
(214) 871-2100 (Telephone)
(214) 871-2111 (Telefax)

and

VINCENT F. O'FLAHERTY
State Bar No. 34693
vaflaherty@voflaw.com
LAW OFFICES OF VINCENT F. O'FLAHERTY,
ATTORNEY, LLC
2 Emanuel Cleaver II Blvd., Suite 445
Kansas City, Missouri 64112
Tel.: (816) 931-4800
Fax.: (816) 756-2168

***ATTORNEYS FOR MT. HAWLEY INSURANCE
COMPANY***

## CERTIFICATE OF SERVICE

I certify that on February 1, 2018, a true and correct copy of the foregoing was served on Defendant/Counter-Plaintiff's counsel *via* ECF, pursuant to the Federal Rules of Civil Procedure.

*/s/ Michael D. Feiler*
Michael D. Feiler

4832-8834-1594, v. 1